**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **GERALD R. HARDY,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION 06-0687-WS-B** |
| | ) |
| **JIM WALTER HOMES, INC.,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 66).  The Motion has been briefed and is ripe for disposition at this time.[1]

**I.    Background Facts.[2]**

In October 1999, plaintiffs Gerald and Bonnie Hardy purchased a parcel of land (the "Property") in Mobile County, Alabama, from two individual sellers (Raymond and Janie Carney) for $55,000.  (Defendants' Exh. 1.)  The terms of sale were such that the Hardys paid a small downpayment at closing, and financed the rest from the Carneys at 12% per annum.  (*Id.*)  The sale contract provided that plaintiffs would pay monthly installments for five years, to be followed by a balloon payment, consisting of the entire remaining principal balance and all accrued interest, on October 15, 2004.  (*Id.*)  By early 2004, the Hardys contemplated selling their existing house (which was located on other property) and building a new house on the

---

[1]      In reviewing the parties' summary judgment briefs, the Court notes that defendants' Reply Brief (doc. 74) exceeds the 15-page limit prescribed by Local Rule 7.1(b) and Paragraph 13(a) of the Rule 16(b) Scheduling Order (doc. 39).  Movants did not seek leave of Court to enlarge that constraint.  In its discretion, the Court will accept the Reply Brief as filed; however, counsel are cautioned that nonconforming briefs are subject to being stricken.

[2]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor.

Property because of the impending balloon payment owed to the Carneys.  (B. Hardy Dep., at 15-16.)  The plaintiffs' plan was to borrow money to pay off the note on the Property and also to finance the construction of a new house on the Property, all in a single transaction to avoid incurring multiple sets of closing costs.  (G. Hardy Dep., at 30-32, 34.)

> ### A.   *The Purchase and Sale Agreement(s).*

In May 2004, the Hardys went to the offices of defendant Jim Walter Homes, Inc. ("JWH") to discuss possible arrangements for such a transaction.  (B. Hardy Dep., at 15-16, 18.)[3] The Hardys spoke with a JWH sales representative at that time.  (*Id.* at 18.)  When they asked him long it would take to build the house, the JWH representative replied that "[o]nce the paperwork was done and, you know, they started, it would be built within a couple of months." (*Id.* at 17.)  The Hardys were not prepared to move forward at that time because their financial circumstances were such that they needed to sell their existing house before they could procure financing for JWH to build a house on the Property.  (*Id.* at 19; G. Hardy Dep., at 34.)  Based on the May 2004 meeting, however, the Hardys "had already made up [their] mind[s] it was going to be a Jim Walter home" that they built on the Property.  (B. Hardy Dep., at 19.)  In fact, they had even decided on the particular model of JWH home that they wanted.  (*Id.* at 16, 22.)

The Hardys accepted an offer to sell their house on July 5, 2004, and returned to JWH's offices two days later to move forward with the financing and construction processes for their new house.  (*Id.* at 16, 19.)  At that time, the Hardys told JWH representatives, "[O]kay, we sold the house, we're ready to build."  (*Id.* at 16.)  During the July 7 meeting, the Hardys again asked JWH how long it would take for the house to be built after the paperwork was completed, and were told that the process would take three or four months.  (G. Hardy Dep., at 36, 39-40.)[4]  The

---

[3]   The record reflects that JWH is a general contractor whose business is to build stick frame residential homes (not modular or pre-fabricated homes) from the ground up on property owned by its customers.  (Alvare Decl. (doc. 67-4), at 1.)

[4]   There was some ambiguity in the record as to whether that three to four month period was intended to run from commencement of construction to completion of construction, or from closing date to completion of construction.  (G. Hardy Dep., at 36-41.)  Viewed in its entirety, Mr. Hardy's testimony supports a reasonable inference that the three to four month period was to begin on the closing date, rather than the date on which groundbreaking occurred.

timing was important to the Hardys because, having sold their existing house, they were going to have to establish temporary living arrangements in a rental house until the construction of their new home was completed.  (*Id.* at 36.)

The Hardys agreed to finance the transaction using only Mr. Hardy's credit, inasmuch as Mrs. Hardy's credit status was problematic because a company she owned had filed for bankruptcy.  (B. Hardy Dep., at 24.)  Accordingly, it is undisputed that on July 7, 2004, Mr. Hardy and JWH entered into a Construction and Purchase and Sale Agreement (Plaintiffs' Exh. A (doc. 70-2)), under which Mr. Hardy agreed to pay JWH $81,100 to build a house on the Property.  Mrs. Hardy was neither a named party nor a signatory to that agreement.

What happened next is somewhat murky in the record.  After the original building contract was executed by Mr. Hardy and JWH, it was determined that Mr. Hardy lacked sufficient credit to borrow both the amount necessary to make the balloon payment on the Property (approximately $41,000) and to build the selected model of house on the Property. (Alvare Decl., at 2.)  This revelation spawned a series of three additional iterations of the Construction and Purchase and Sale Agreement (Plaintiffs' Exhs. B-D), all of which JWH faxed to the Hardys for execution sometime between July 7, 2004 and early October 2004.  (B. Hardy Dep., at 73-74, 95-96.)  These new versions of the agreement were backdated to July 7, 2004 at JWH's behest, even though they were signed sometime later, and all three listed a purchase price of $73,550, to remain within the credit limits for which Mr. Hardy qualified.  (Plaintiffs' Exhs. B-D.)  JWH never explained to the Hardys why it was necessary for this agreement to be re-executed on multiple occasions, or why each iteration was being backdated to July 7, 2004.  (B. Hardy Dep., at 78.)[5]  To confuse matters further, while one iteration of the $73,550 Purchase and Sale Agreement was executed solely by Mr. Hardy and JWH (Plaintiffs' Exh. B), and the second is missing a signature page altogether (Plaintiffs' Exh. C) such that it is unclear whether anyone signed it, the third version of the agreement is ambiguous.  The first page of that document states that it is a Purchase and Sale Agreement between Mr. Hardy and JWH; however, in the signature

---

[5]     Nor have the parties placed in the record any testimony by JWH officials that might shed light on what was happening or why this multiplicity of confusingly backdated redundant contracts was necessary.

block, both Mr. and Mrs. Hardy signed the agreement under the "Buyer" heading.  (Plaintiffs'
Exh. D.)  From this record, it is unclear why the $73,550 Purchase and Sale Agreement was
executed three times, or why Mrs. Hardy signed one version of that contract as a "Buyer" but not
the others.[6]  Thanks to poor recordkeeping by the parties, JWH's decision to backdate the
contracts, and the paucity of record evidence as to the sequence of events between July 2004 and
October 2004, it is also unclear which of the three later versions of the agreement was actually
the binding and final version.[7]

   All three versions of the later Purchase and Sale Agreement shared an identical
Paragraph 4, which read in its entirety as follows: "<u>Completion Date.  NO COMPLETION</u>
<u>DATE HAS BEEN REPRESENTED OR IS A PART OF THIS CONTRACT</u>."  (Plaintiffs'
Exhs. B-D.)  But there were also differences among the versions.  For example, one of the
contracts had attached as Exhibit D an Arbitration Agreement, which was separately signed by
JWH and Mr. Hardy and dated July 7, 2004.  (Plaintiffs' Exh. D; Defendants' Exh. 3.)  It does
not appear from this record that the parties signed the Arbitration Agreement in connection with
any other iterations of the Purchase and Sale Agreement, or that Mrs. Hardy ever signed any

---

[6]  When asked why she signed only one version of the agreement, Mrs. Hardy
testified, "I don't know."  (B. Hardy Dep., at 85.)   Apparently, then, this sequence of events is
as perplexing to plaintiffs as it is to this Court.  Because Mrs. Hardy is not listed as a buyer in the
contract recitals and because it was apparently understood that she would not be a buyer because
of her credit problems, it seems likely that Mrs. Hardy signed the one version of the agreement
in error; however, the Court cannot make such a finding of fact at the summary judgment stage.
Conflicting inferences that may reasonably be drawn from the record facts; therefore, the
question of whether Mrs. Hardy was or was not a party to the Purchase and Sale Agreement is
for the jury.

[7]  In their brief, defendants assert that the iteration of the Purchase and Sale
Agreement signed by Mrs. Hardy was executed in August 2004.  (Defendants' Brief (doc. 67), at
4.)  However, the Court has been unable to locate any record evidence corroborating this
timeframe, and will not endorse speculation as to when this event occurred.  Similarly,
defendants take the position that the agreement "which JWH considers to be in force is between
JWH and Mr. Hardy only, as Mrs. Hardy is not a party to such contract" (Alvare Decl, at 2)
without offering any principled evidentiary basis for that belief.  At the summary judgment
stage, the Court cannot select from the three possible iterations of the $73,550 Purchase and Sale
Agreement on the ground that the movant deems one or another of them to be the operative
document with no factual foundation for such a designation.

Arbitration Agreement.[8]

###### B.       The Closing.

The financing of the Hardys' transaction was handled by defendant Walter Mortgage Company ("WMC"), not by JWH.  (Alvare Decl., at 2.)  WMC, a separate company from JWH, was to provide the funds to pay off the balloon payment on the Property, and also to finance the construction cost for the Hardys' new home.  (*Id.* at 2-3.)  It was contemplated that when construction was substantially completed by JWH, WMC would pay the sales price of the home to JWH.  (*Id.* at 3.)[9]  This separation of responsibilities was apparent to plaintiffs, who understood that WMC was to approve the financing and that JWH was to construct the house.  (G. Hardy Dep., at 58-59; B. Hardy Dep., at 68.)  Plaintiffs similarly understood that WMC was to have no role in building the house, and that JWH was to have no role in financing the deal.  (G. Hardy Dep., at 58-59; B. Hardy Dep., at 68.)

The closing on the loan from WMC to the Hardys took place on October 13, 2004, a scant two days before the balloon payment deadline.  (Alvare Decl., at 3.)  The HUD-1 Settlement Statement confirms that WMC lent $99,522.00 to the Hardys, with both Mr. and Mrs. Hardy being listed as borrowers and signing the statement as borrowers.  (Defendants' Exh. 7.)  As part of this transaction, the Hardys made a downpayment of $15,100.00, and WMC paid the balloon payment to the Carneys in the amount of $40,666.27.  (*Id.*; Alvare Decl., at 3.)  It is undisputed that WMC timely made the balloon payment in full, removing the Carneys' lien from

---

[8]       There is uncertainty, however, as to whether the Arbitration Agreement was appended to the $81,100 contract or to one of the $73,550 contracts.  In plaintiffs' exhibits, the Arbitration Agreement is attached to the $81,100 contract and not to any of the $73,550 agreements.  (Plaintiffs' Exh. A.)  By contrast, in defendants' exhibits, precisely the same Arbitration Agreement is attached to one of the $73,550 contracts not signed by Mrs. Hardy, and is not appended to the $81,100 contract.  (Defendants' Exh. 3.)  It is difficult to understand the genesis of that discrepancy, given that both parties are working from the same underlying set of documents in this case, and neither side proffers any explanation to aid the Court's understanding.

[9]       Until such time as the construction process was substantially complete, JWH bore sole responsibility for construction costs, subject to payment of the sales price by WMC upon substantial completion.  (*Id.*)  Thus, JWH was to pay all construction costs upfront, and was not to be compensated for its work or its expenditures until the project was substantially completed.

the Property.  (G. Hardy Dep., at 83.)  In consideration of that loan, Mr. Hardy (but, in a further

bout of inconsistency, not Mrs. Hardy) executed a Promissory Note and Allonge, agreeing to

repay the loan amount to WMC over a 30-year period, at an interest rate of 9.250%, with

monthly mortgage payments to commence on March 1, 2005.  (Defendants' Exh. 8.)  Also on the

October 13, 2004 closing date, both Mr. Hardy and Mrs. Hardy executed a Mortgage in WMC's

favor to secure the loan.  (Defendants' Exh. 9.)[10]

   **C.**  ***The Construction Process.***

   After the October 2004 closing, there was a substantial delay, at least in part because of

disruptions stemming from Hurricane Ivan's landfall on the Alabama Gulf Coast in September

2004.  (Alvare Decl., at 3.)[11]  Although Ivan predated the closing by a month, JWH never told

plaintiffs before closing that the company was too busy to build the Hardys' home, that

subcontractors were unavailable to work on the project, or the like.  (G. Hardy Dep., at 73.)  In

short, JWH never suggested to plaintiffs prior to closing that Hurricane Ivan would materially

affect any estimated construction timetable.[12]  In late 2004, Mrs. Hardy contacted JWH to

ascertain the reasons for the delay, and was told by JWH's Pensacola branch manager, Ron

Malone, that the hurricane had caused difficulties for JWH to obtain the necessary building

permits.  (B. Hardy Dep., at 53.)  Malone reiterated that explanation in early January 2005.  (*Id.*

at 54.)  At that time, JWH assured Mrs. Hardy that the permit applications had been made;

however, she went to the building permit office herself in late 2004 or early 2005 and learned

---

[10]  Both Hardys, rather than simply Mr. Hardy, executed the Mortgage because the
Property was owned by both of them jointly.  (G. Hardy Dep., at 67.)

[11]  Curiously, defendants submitted a discovery document in which they responded
to a plaintiffs' interrogatory as to the reasons for the delay between October 2004 and March
2005 by stating as follows: "The primary reason for the delay was the after effects of Hurricanes
Ivan and Katrina."  (Defendants' Exh. 6.)  The Court takes judicial notice that Hurricane Katrina
struck the Gulf Coast region on August 29, 2005, some five months after the time period
requested by the interrogatory and approximately one month after plaintiffs had posted a "No
Trespassing" sign and barred JWH from all construction activities on the Property.

[12]  This omission appears to account for a substantial measure of plaintiffs'
dissatisfaction with JWH.  As Mr. Hardy testified, "they would have known [of the Ivan-related
problems] before they sold me my house, or they should have because the storm was in
September, and we signed the paperwork in October."  (G. Hardy, Dep., at 90.)

that JAH's statements in this regard were false.  (*Id.* at 64.)

Plaintiffs had subjectively expected that their home would be finished by February 1, 2005.  (G. Hardy Dep., at 141.)  That date came and went without JWH having accomplished even the initial steps in the construction process.  As the March 1, 2005 deadline for the Hardys' first mortgage payment drew near, with no sign of any construction activity by JWH, Mrs. Hardy called WMC to discuss the situation.  (G. Hardy Dep., at 140.)  At that time, WMC advised that plaintiffs would not be required to make any payments on the promissory note until the house was completed.  (*Id.* at 78-79, 89, 140.)  This accommodation was satisfactory to plaintiffs, who had no complaints about WMC's handling of the situation.  (B. Hardy Dep., at 69.)[13]  At no time prior to the suspension of construction in August 2005 did WMC or JWH ever demand payment from the Hardys under the terms of the promissory note and mortgage.  (G. Hardy Dep., at 73-74.)

In March 2005, JWH finally took tangible steps to build the house.  On March 30, 2005, JWH applied to the Mobile County Building Inspection Office for a building permit for the Hardys' house, and such permit was issued on that same date.  (Defendants' Exhs. 10, 11.)  Little progress was made during the spring of 2005.[14]  However, the construction process gained momentum in the summer of 2005.  The footings of the home were approved by the Mobile County Inspection Department on June 8, 2005, and the foundation was approved on July 27, 2005.  (Defendants' Exh. 12.)  All told, JWH advanced some $19,000 in materials and labor

---

[13]     Mrs. Hardy's testimony was that her dissatisfaction with WMC stemmed not from anything that entity did in 2004 or 2005, but from the manner in which WMC initiated foreclosure proceedings in 2006, without providing notice to the Hardys in that regard.  (B. Hardy Dep., at 100-01.)  The ensuing wrongful foreclosure claim has been dismissed and is no longer before this Court.

[14]     When JWH failed to commence construction promptly after the building permit was secured, Mrs. Hardy again called Malone to inquire about the delay.  According to Mrs. Hardy, Malone "got real ugly, asked me what in the hell he wanted me to do about it.  It wasn't his problem no more."  (B. Hardy Dep., at 55.)  Such undiplomatic statements served to stoke the fires of plaintiffs' discontent.  Similarly, Mrs. Hardy's efforts to contact another JWH official, Gene Pappa, were unsuccessful, as he failed to return her repeated calls.  (*Id.* at 56.)  Based on these practices, the Hardys ultimately lodged two complaints against JWH with the Better Business Bureau, in addition to commencing this litigation.  (*Id.*)

costs for the construction work that it performed on the Hardys' home.  (Alvare Decl., at 3.)

In or about June 2005, JWH delivered a load of untreated lumber and construction materials to the job site for use in constructing the house.  (G. Hardy Dep., at 79-80.)  JWH allowed that wood to sit out in the elements for a period of months, uncovered on the ground. (*Id.*)  When plaintiffs inspected these building materials in August 2005, they observed the wood to be warped, split, discolored, and otherwise damaged from the adverse effects of being left outside, exposed, by JWH for a period of several months.  (*Id.*)

Plaintiffs refused to allow JWH to move forward with the construction using those weathered materials.  (*Id.*)  A construction manager assured the Hardys that JWH would not use any of the damaged lumber in building the house; however, notwithstanding this assurance, plaintiffs observed construction crews using crooked, warped materials on the house.  (B. Hardy Dep., at 103.)  On that basis, plaintiffs demanded that the construction crew leave the Property, which they did, only to return a short time later.  (*Id.*)  Plaintiffs spoke with Malone (JWH's branch manager) and advised him that they would not accept the lumber, in response to which Malone stated that they had no choice in the matter.  (*Id.* at 105.)  Unsatisfied, plaintiffs took matters into their own hands.  In early August, plaintiffs directed Malone that the construction crews were not to return to their Property.  (*Id.*)  To reinforce this directive, plaintiffs erected a gate and a "No Trespassing" sign on the Property to keep the JWH construction crews off site. (*Id.* at 104-05.)  Yet JWH crews returned twice, despite plaintiffs' express oral and written statements to JWH that plaintiffs would deem those construction workers trespassers if they set foot on their Property.  (*Id.* at 105.)  When Mrs. Hardy found construction workers on site despite the "No Trespassing" sign, she "told them if they didn't stop, load up, that [she] would call the law and have them arrested for trespassing."  (*Id.*)  The construction crew left. Apparently no further construction work was ever performed on the Property in the intervening 31 months.

The net effect of these developments was a stalemate that culminated in the filing of this lawsuit in October 2006.  To date, plaintiffs have never made a single payment on their October 2004 loan, either to JWH or WMC.  (G. Hardy Dep., at 73.)  The house has never been completed.  (*Id.* at 79.)  Sometime in 2007, WMC assigned to JWH the Hardys' mortgage, promissory note, and the secured debt.  (Alvare Decl., at 3.)

II.     **Relevant Procedural History.**

        As initially formulated, the Hardys' Complaint included no fewer than eight state-law

causes of action, to-wit: a claim for declaratory judgment (Count One) seeking a declaration that

the building and financing agreements were void for failure of consideration; a claim for

preliminary injunction (Count Two) seeking to prevent defendants from entering or selling the

Property; a claim for fraud in the inducement (Count Three) alleging that JWH and WMC

intentionally represented to the Hardys that construction of the home would begin within 60 days

and that JWH was capable of performing the work in that time frame; a claim that JWH

fraudulently induced Mr. Hardy to sign an arbitration agreement (Count Four); a claim of

reckless misrepresentation (Count Five) alleging that defendants misrepresented that

construction would begin within 60 days and that JWH was capable of performing the work; a

catch-all claim of negligence/wantonness (Count Six) alleging that JWH wrongfully

misrepresented the construction date, failed to apply for permits, failed to communicate with the

Hardys about the construction status, failed to commence construction for 10 months, allowed

unskilled workmen to perform the job, and utilized damaged materials; a claim of trespass

(Count Seven) based on JWH employees or agents allegedly trespassing on the Hardys' land;

and a claim of wrongful foreclosure (Count Eight) based on WMC's initiation of foreclosure

proceedings against the Hardys without notice in 2006.

        Certain of those causes of action are no longer actively proceeding before this Court.

Plaintiffs abandoned their claim for preliminary injunction based on agreement among the

parties shortly after this action commenced.  (*See* doc. 7.)[15]  Accordingly, Count Two is

**dismissed without prejudice** by consent of the parties.  On January 18, 2007, the undersigned

entered an Order (doc. 19) compelling Mr. Hardy and JWH to proceed to arbitration as to all

causes of action between them, stayed those claims as between those parties pending the

_____

        [15]     In summary judgment filings, the parties reiterated their understanding that the
claim for preliminary injunction is no longer a part of these proceedings.   Defendants asserted in
their principal brief that the claim for preliminary injunction is moot.  (Doc. 67, at 10.)  Plaintiffs
concurred.  (Doc. 70, at 6.)

conclusion of arbitral proceedings,[16] and dismissed Count Eight (wrongful foreclosure) in its entirety for failure to state a claim.

In light of the foregoing developments, Counts Two (preliminary injunction) and Eight (wrongful foreclosure) are no longer in play. The same goes for all of Mr. Hardy's claims against JWH, which have been referred to arbitration. Thus, the active claims remaining in this case are both plaintiffs' claims against WMC for declaratory judgment, fraud in the inducement, and reckless misrepresentation; as well as Mrs. Hardy's claims against JWH for declaratory judgment, fraud in the inducement, reckless misrepresentation, negligence/wantonness, and trespass. It is to those claims that the parties' summary judgment submissions are directed.

## III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the

---

[16]    JWH's latest Arbitration Status Report (doc. 76) filed on March 26, 2008 states that the arbitration hearing for Mr. Hardy's claims against JWH has been reset for April 10, 2008, approximately three weeks before contemplated jury selection as to the claims in this District Court. Thus, the jury trial of the claims in this District Court and the arbitration proceedings are on similar temporal tracks. Regrettably, the arbitrator and this Court are tasked with making duplicative determinations, as this Court must determine the merits of Mrs. Hardy's claims against JWH and the arbitrator must decide the merits of Mr. Hardy's identical claims against JWH. There are obvious inefficiencies to having this Court and the arbitrator tread the same ground as to the same legal claims, yet that is how this case is now postured. At the time of the order compelling arbitration, the Court was unaware that Mrs. Hardy had signed and claimed to be bound by a version of the Purchase and Sale Agreement.

truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV.   Analysis.

The summary judgment analysis is fragmented and complicated by the manner in which plaintiffs pleaded their Complaint.[17]  As discussed *supra*, Mr. and Mrs. Hardy lumped together their individual claims in an undifferentiated form, and directed many of those claims at both JWH and WMC without distinguishing meaningfully between them.  This is so despite the fact that WMC's and JWH's roles in the underlying facts were undisputedly distinct and could have easily been separated out in the pleadings with reasonable diligence.  Now, all of Mr. Hardy's claims against JWH have been referred to arbitration, but Mrs. Hardy's claims against that entity remain in this District Court.  And both plaintiffs' claims against WMC (which generally parallel their claims against JWH) remain.  To facilitate orderly discussion of these claims, the Court will address them on a count-by-count basis, disentangling plaintiffs' claims against WMC from Mrs.

---

[17]    Essentially, plaintiffs' counsel transformed the straightforward underlying facts into a convoluted maze of overlapping but not identical claims brought by two different plaintiffs against two different defendants.  Potentially meritorious claims have been fused to obviously meritless claims of multiple plaintiffs as to multiple defendants in such a confusing fashion that it is both difficult and time-consuming to untangle this commingled mass of claims to a point where they may be scrutinized coherently.  Packing multiple claims by multiple plaintiffs against multiple defendants, including some plainly meritless claims, into a single conclusory cause of action is the very essence of shotgun pleading.  *See generally Fikes v. City of Daphne*, 79 F.3d 1079, 1082 (11th Cir. 1996) ("By combining several claims for relief in each count, appellant disregarded the rules governing the presentation of claims to a district court."); *Byrne v. Nezhat*, 261 F.3d 1075, 1130 (11th Cir. 2001) (decrying litigation practice of filing shotgun complaints including frivolous claims to extort the settlement of meritorious claims).  As counsel are surely aware, the Eleventh Circuit has often spoken out emphatically against such techniques, and has recently sharpened the rhetoric by urging District Courts to take preemptive action to curb such abuses at an early stage in the proceedings, thereby mitigating the inefficiencies, delays and other mischiefs that shotgun pleading otherwise elicits.  *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 981-84 (11th Cir. 2008).  In fairness, the Court recognizes that plaintiffs originally filed their Complaint in state court; however, these defects could and should have been remediated subsequent to removal.

Hardy's claims against JWH within the same count where appropriate.

        ***A.      Mrs. Hardy's Declaratory Judgment Claim as to JWH Contract.***

      Part of Count One of the Complaint is Mrs. Hardy's request that this Court declare that "[t]he building agreement between Jim Walter and the Hardys is void due to failure of consideration." (Complaint, ¶ 19.) Under Alabama law, failure of consideration is an affirmative defense to enforcement of a contract. Definitionally, "[f]ailure of consideration is the neglect, refusal and failure of one of the contracting parties to do, perform, or furnish, after making and entering into the contract, the consideration in substance and in fact agreed on." *BSI Rentals, Inc. v. Wendt*, 893 So.2d 1184, 1189 (Ala.Civ.App. 2004) (citations and internal quotations omitted). Simply stated, Mrs. Hardy's position is that JWH's failure to construct the home voids the Purchase and Sale Agreement that she signed.

      As an initial matter, JWH contends that dismissal is warranted because Mrs. Hardy was not a party to the Purchase and Sale Agreement. If Mrs. Hardy did not sign that agreement, then she plainly lacks standing to seek a declaratory judgment as to the enforceability of that agreement. There are three versions of that Agreement listing the correct, final sales price of $73,550. Two are executed by JWH and Mr. Hardy, but only one of those was signed by Mrs. Hardy, as well. (The signatories of the third are unknown because the signature page is omitted from the record.) Thus, there is one version of the Purchase and Sale Agreement as to which only JWH and Mr. Hardy are parties; a second version as to which JWH, Mr. Hardy and Mrs. Hardy are all parties; and a third as to which the signatories (if any) are indeterminate under this record. The obvious question is which of these three iterations is binding.

      The law of Alabama is well established that "parties are free to modify agreements, and if the terms of a subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail." *Cavalier Mfg., Inc. v. Clarke*, 862 So.2d 634, 641 (Ala. 2003).[18] So,

---

[18]     Indeed, "[w]hen parties execute successive agreements and the two agreements cover the same subject matter and include inconsistent terms, the later agreement supersedes the earlier agreement." *Hunter v. Wilshire Credit Corp.*, 927 So.2d 810, 814 (Ala. 2005) (quoting *Cavalier*, 862 So.2d at 641); *see generally Restatement (First) of Contracts*, § 408 ("A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract.").

whichever of the three Purchase and Sale Agreements listing a sales price of $73,550 was the last to be executed is binding, and the previous two iterations are superseded. It is a question of fact as to which of those agreements was the last to be signed. Unfortunately, the record on summary judgment is poorly developed as to which contract was executed when. JWH offers nothing other than its own say-so that the governing agreement was not the one that Mrs. Hardy executed. That is simply not good enough.[19] As such, JWH has failed to satisfy its initial burden

---

[19]    At best, JWH asks the Court to conclude as a matter of law that Mrs. Hardy is not a signatory to the Purchase and Sale Agreement because "JWH has consistently contended that the governing version of the Building Contract is that version" which was signed only by Mr. Hardy and JWH. (Reply Brief (doc. 74), at 10.) But JWH points to no record evidence to support that contention. Nor is it accurate to suggest, as JWH does, that Mrs. Hardy has failed timely to dispute JWH's position and has somehow waived her right to challenge it now. The Complaint itself sets forth Mrs. Hardy's contention from the outset of the proceedings that she was a party to the Purchase and Sale Agreement, alleging, "On or about July 7, 2004, the Plaintiffs entered into a building agreement with Jim Walter ...." (Complaint, ¶ 6.) Just as JWH's position has been that Mrs. Hardy was not a signatory to the governing agreement, so too has it been plaintiffs' position that she was. This is a classic factual dispute to be submitted to the jury at trial. Equally unpersuasive is JWH's attempt to devise a judicial estoppel argument from plaintiffs' contention in a brief on the arbitration issue that "Bonnie Hardy does not seek any benefit from a contract containing or subject to an arbitration provision." (Defendants' Brief (doc. 67), at 14.) A fundamental prerequisite for application of judicial estoppel is that "a party's later position must be clearly inconsistent with its earlier position." *Chapman Nursing Home, Inc. v. McDonald*, --- So.2d ----, 2007 WL 3409013, *7 (Ala. Nov. 16, 2007). There is no clear inconsistency here. Previously, plaintiffs argued to this Court that Mrs. Hardy was not seeking benefit from any contract containing an arbitration provision. Now plaintiffs say that the Purchase and Sale Agreement signed by Mrs. Hardy governs the relationship between plaintiffs and JWH. But no party has placed in the record a copy of the Mrs. Hardy-signed agreement with an arbitration agreement exhibit; indeed, it appears that no such arbitration agreement exists as to that iteration of the contract. While the Purchase and Sale Agreement references an "Arbitration Agreement set forth in Exhibit D attached hereto," it does not appear that said attachment was actually presented to her. (*See* Plaintiffs' Exh. D; Defendants' Exh. 5.) As to Mrs. Hardy, then, the record in the light most favorable to her reflects that the arbitration agreement was a phantom document, and there is no evidence that she was ever shown that attachment in connection with her execution of the Purchase and Sale Agreement. There being no fundamental, clear inconsistency between plaintiffs' position in opposing the compulsion of arbitration of Mrs. Hardy's claims (*i.e.*, that she seeks no benefit from a contract containing an arbitration provision) and Mrs. Hardy's argument today (*i.e.*, that the Purchase and Sale Agreement she signed is the governing document), defendants' appeal to judicial estoppel principles is misplaced.

-13-

on summary judgment as to the theory that Mrs. Hardy was not a party to the building contract. JWH is not entitled to Rule 56 relief on that basis.

Next, JWH argues that Mrs. Hardy cannot void the contract for failure of consideration because there was undoubtedly consideration for the agreement in the form of the parties' mutual promises to perform.  This argument conflates the distinct doctrines of lack of consideration (a contract formation issue which goes to the existence of a contract in the first instance) and failure of consideration (a contract performance issue under which an otherwise valid contract may be voided by one party after the fact for the other party's failure to perform).  *Compare Lemaster v. Dutton*, 694 So.2d 1360, 1366 (Ala.Civ.App. 1996) ("Typically, a total failure of consideration is used as an excuse for nonperformance of a contract.") *with Marcrum v. Embry*, 282 So.2d 49, 51 (Ala. 1973) (valid contract requires "valuable consideration moving from one side to the other" or "binding promises on the part of each party to the other"); *see generally Belew v. Rector*, 202 S.W.3d 849, 854 n.4 (Tex.App.-Eastland 2006) (explaining that "lack of consideration" and "failure of consideration" represent different defenses, and that "lack of consideration exists, if at all, immediately after the execution of a contract while failure of consideration arises because of subsequent events").  Whether the Purchase and Sale Agreement was supported by consideration at the time of execution (as JWH correctly states that it was) is irrelevant to the issue presented in Count One, which is whether that agreement is voidable by Mrs. Hardy for failure of consideration by JWH.

In a further effort to bolster their Rule 56 motion, defendants, citing to no Alabama authority, suggest in their reply brief that Mrs. Hardy has misstated the law of failure of consideration.  But defendants' position in this regard cannot be reconciled with the clear language of the *Lemaster / BSI Rentals* line of Alabama authority, pursuant to which a party may be excused from performing under a valid contract if the other party neglected, refused and failed to furnish the agreed-upon consideration.  Plaintiffs have made a showing that JWH did not in fact build the house as it had agreed to do in the Purchase and Sale Agreement.  For that reason, JWH is not entitled to summary judgment on Mrs. Hardy's request for a declaration that she is excused from performance under that agreement on failure of consideration grounds.

Finally, in their reply brief, defendants argue that summary judgment should be granted in JWH's favor on Count One because JWH's failure to build the house amounts to incomplete

-14-

performance, rather than a total failure of consideration.  (Reply Brief, at 4-5.)  This argument could and should have been raised in movants' principal brief to afford Mrs. Hardy a reasonable opportunity to be heard in response.  In order to avoid a scenario in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them, this Court does not consider arguments raised for the first time in a reply brief.  *See, e.g., Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 n.89 (S.D. Ala. 2006) ("this argument is not properly raised because plaintiffs submitted it for the first time in their reply brief"); *United States v. Feinberg*, 89 F.3d 333, 341 (7th Cir. 1996) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court.").[20]  JWH's "incomplete performance" contention runs afoul of that proscription, and will not be considered at this time.[21]

    For all of these reasons, the Court finds that JWH is not entitled to summary judgment on Mrs. Hardy's claim in Count One that the Purchase and Sale Agreement is void for failure of consideration.

    **B.    *Plaintiffs' Declaratory Judgment Claim as to WMC Financing Agreements.***

    Also in Count One, both plaintiffs seek a declaration that the financing agreements

---

[20]    This rule works no hardship on JWH, which has previously been admonished in this very case that arguments raised for the first time in reply briefs will not be considered.  *See Hardy v. Jim Walter Homes, Inc.*, 2007 WL 174391, *3 n.2 (S.D. Ala. Jan. 18, 2007) (refusing to consider argument raised by JWH for the first time in a reply brief).

[21]    Even if that argument were properly presented, all appearances are that it would be a jury question to determine whether JWH's performance on the Purchase and Sale Agreement amounts to a total failure of consideration (which would void the agreement) or partial but incomplete performance (which would not excuse Mrs. Hardy's performance).  Indeed, while the record reflects that JWH set footings, poured a foundation, and engaged in some frame construction, plaintiffs' allegations of shoddy materials and crumbling mortar renders it a jury question as to whether Mrs. Hardy in fact received any meaningful benefit from JWH's efforts.  The Court will entertain an appropriate jointly proposed jury charge and special interrogatories on this question, if the parties submit them in accordance with the schedule to be set at the final pretrial conference in this matter.

(presumably, the Promissory Note and the Mortgage) between WMC and the Hardys are void for failure of consideration.  (Complaint, ¶ 20.)  In seeking summary judgment, WMC emphasizes that it is undisputed that WMC in fact performed under those agreements by advancing in excess of $40,000 on the Hardys' behalf in October 2007 to satisfy the balloon payment that the Hardys owed on that Property.  (Even if plaintiffs' downpayment is offset from that figure, WMC's out-of-pocket outlay on this loan transaction exceeds $25,000.)

Despite the fact that WMC has plainly performed under the financing agreements to the tune of more than $40,000, plaintiffs maintain that the finance agreements are void for failure of consideration because "Plaintiffs, through no fault of their own, have not performed the promised act of repaying their mortgage with WMC."  (Plaintiffs' Brief (doc. 70), at 5.)  This startling notion turns the "failure of consideration" defense on its head.  As discussed in Section IV.A., *supra*, this affirmative defense is available to excuse one party from performance when the other party has failed to perform.  Here, however, the Hardys would utilize that doctrine to strike down a contract based on <u>their own</u> failure to perform.  Plaintiffs do not cite any authority for the proposition that a party to a contract may invoke the failure of consideration defense to invalidate a contract where that party itself (rather than some other contracting party) has failed to perform.  The Court perceives no legal or theoretical basis for expanding the defense so broadly to allow a party's own refusal to perform to trigger its ability to void the contract for failure of consideration.  Simply put, the Hardys cannot parlay their failure to pay a penny of principal or interest on their debt in three and a half years into a legal right to walk away from their contractual obligation to repay WMC.  *See Jones v. Pullen*, 66 Ala. 306 (Ala. 1880) ("Jones could not, by his own breach of promise, claim that the contract was annulled").

In a further exercise of opaque reasoning, the Hardys maintain that the failure of consideration defense should be available to them as to the WMC financing agreements because of JWH's failure to perform under the Purchase and Sale Agreement.  In particular, plaintiffs contend that they "did not enter into two separate transactions with a builder and a mortgage company, but instead entered into one transaction."  (Plaintiffs' Brief (doc. 70), at 5.)  Undisputed record evidence belies this assertion.  Plaintiffs' own sworn testimony is that they dealt with JWH exclusively on construction matters, and dealt with WMC exclusively on finance matters.  WMC was not a party to the building contract, and JWH was not a party to the finance

-16-

agreements.  As such, any failure of JWH to perform under the Purchase and Sale Agreement does not amount to a failure of consideration for the financing agreements, where the record unambiguously establishes that (a) JWH was not a party to the financing agreements, and (b) WMC did in fact materially perform certain obligations under the financing agreements.[22]

For all of the foregoing reasons, the Court is of the opinion that there are no genuine issues of material fact and that defendant WMC is entitled to entry of judgment in its favor as a matter of law on Count One to the extent that plaintiffs seek a declaration that the financing agreements between the Hardys and WMC are void for failure of consideration.  Summary judgment will be **granted** in WMC's favor on Count One.

### C.    *Plaintiffs' Fraud and Reckless Misrepresentation Claims against WMC.*

Defendants' Motion for Summary Judgment also encompasses plaintiffs' claims against WMC for fraud in the inducement in Count Three, and for reckless misrepresentation in Count Five.  As pleaded, both of those counts allege that "[t]he Defendants ... misrepresented to the Hardys that construction on their home would commence within sixty (60) days and that Jim Walter as the contractor was capable of initiating and performing said work within said time-frame."  (Complaint, ¶¶ 26, 34.)  According to the Complaint, defendants knew or should have known these representations to be false, and made them "for the purpose of inducing the Hardys into entering said agreements."  (*Id.*, ¶¶ 27, 35.)

---

[22]    To be sure, WMC did not pay over the sale price of the house to JWH because that amount was not payable until the house was substantially completed, which never happened (thanks in part to plaintiffs' ejection and banishment of the JWH construction crews from their property).  If WMC's sole obligation under the financing agreements was to remit sales proceeds to JWH, the Hardys might have a compelling argument for failure of consideration.  But WMC's contractual obligations were not so limited.  To the contrary, it is undisputed that the financing agreements required WMC to pay $40,666 on the Hardys' behalf to the Carneys, and that WMC in fact did so.  Of that amount, it could be argued that $15,100 represented the downpayment made by plaintiffs at closing.  Even so, however, the uncontroverted fact remains that WMC paid $25,500 out of pocket after the closing pursuant to its obligations under the financing agreements, and that such payment conferred a direct, material benefit on the Hardys.  Plaintiffs cannot use the failure of consideration doctrine to shirk their contractual responsibility to repay that $25,500 amount (plus interest) to WMC, merely because another aspect of WMC's performance under the financing agreements never came to fruition.  To hold otherwise would be inequitable, grossly unfair, and would subvert the basic purposes of the failure of consideration affirmative defense.

Viewing the summary judgment record in the light most favorable to plaintiffs, the only misrepresentations that predate the October 2004 closing date are as follows: (1) a statement by JWH sales representative Walter Loyle to plaintiffs in May 2004 that JWH would build their house "within a couple of months" after the paperwork was completed and the construction process began; and (2) a statement by Loyle to plaintiffs in July 2004 that the building process would take three or four months after the paperwork was completed.[23]  It is uncontroverted that Loyle was a JWH employee, not a WMC employee.  (Alvare Decl., at 2.)  Moreover, both plaintiffs have admitted that they understood WMC's role to be confined to financing the transaction, and that construction of the house was within JWH's sole purview.

In the Rule 56 Motion, WMC maintains that plaintiffs' claims for fraud and reckless misrepresentation against it fail as a matter of law because the alleged misrepresentations were made by JWH, not by WMC.  Although they apparently concede that the misrepresentations were nominally made by JWH, plaintiffs counter that each defendant company was the agent of the other for purposes of this transaction, such that JWH's misrepresentations may be ascribed to WMC.  (Plaintiffs' Brief, at 7-9.)[24]  Under Alabama law, "when a defendant's liability is based on the theory of agency, agency may not be presumed, and ... [to support a finding of liability] the plaintiff must present substantial evidence of an agency relationship."  *Wallace v. Frontier Bank, N.A.*, 903 So.2d 792, 801 (Ala. 2004) (citation and internal quotation marks omitted).

---

[23]    To be sure, there is reference in the record to statements made by JWH representatives in October 2004, approximately one week <u>after</u> closing, that construction would commence "right away."  (G. Hardy Dep., at 69; B. Hardy Dep., at 88.)  Plaintiffs concede that those statements do not form the basis of their claims for fraud or misrepresentation because they post-dated plaintiffs' execution of the relevant agreements.  (Plaintiffs' Brief, at 13.)  Therefore, these statements will not be considered in the analysis of Counts III and V.

[24]    Defendants suggest that the summary judgment stage is too late in the case for plaintiffs to invoke for the first time their theory that WMC and JWH are agents of each other; however, defendants offer no authority and make no persuasive argument that applicable law would have required plaintiffs affirmatively to plead that theory in their Complaint.  This Court has previously pointed out such an omission by defendants as to this precise legal issue.  (*See* doc. 19, at 9 n.7.)  Once again, this Court will not perform movants' research for them to ascertain the relevant pleading requirements for agency theories under applicable law and rules of procedure.

-18-

"[W]hen on a motion for summary judgment a defendant has made a prima facie showing that there was no agency relationship, the party asserting agency has the burden of presenting substantial evidence of the alleged agency." *Thrash v. Credit Acceptance Corp.*, 821 So.2d 968, 972 (Ala. 2001); *see also Battles v. Ford Motor Credit Co.*, 597 So.2d 688, 689 (Ala. 1992) ("when a defendant's liability is based on the theory of agency, agency may not be presumed, and ... to defeat a defendant's properly supported summary judgment motion, the plaintiff must present substantial evidence of an agency relationship").

        In this case, the Hardys proffer no evidence of an express agency relationship between JWH and WMC, but instead predicate their agency arguments on a theory of implied agency.  It is of course true that "an agency relationship may arise from facts that lead others to believe that such a relationship has been created."  *Battles*, 597 So.2d at 689.  Alabama courts require that "before there can be apparent authority that implies an agency relationship, the 'authority' must be 'apparent' to the complaining party and that party must have relied on the appearance of authority."  *Watson v. Auto-Owners Ins. Co.*, 599 So.2d 1133, 1136 (Ala. 1992).  To a support a finding of implied agency, "the facts must lead to the reasonable conclusion that mutual assent exists."  *Birmingham News Co. v. Birmingham Printing Co.*, 104 So. 506, 508 (Ala. 1925).  Alabama courts have looked askance at attempts such as the Hardys' to hold a finance company liable for a retailer's misrepresentations using agency principles.  *See Kimbrel v. Mercedes-Benz Credit Corp.*, 476 So.2d. 94 (Ala. 1985) (finding that absent other indicia of principal-agent relationship, credit corporation was not principal of independent retailer of farm equipment, even though credit corporation's name and credit terms were included on credit contract provided by retailer to customer).[25]

        Plaintiffs argue that "it was reasonable for the Hardys to believe that the two companies were closely related and that each company was the agent of the other."  (Plaintiffs' Brief, at 7.)

---

        [25]        *See also Battles*, 597 So.2d at 691 (affirming summary judgment for credit company on fraud claim based on misrepresentations by dealer, where no agency relationship could be found even though credit company's name appeared on lease provided by dealer, credit company controlled terms of lease, and credit company's plaques were displayed on dealer walls); *Turner v. Deutz-Allis Credit Corp.*, 544 So.2d 840, 843 (Ala. 1988) (no principal-agent relationship between credit corporation and dealer where dealer presented credit company's finance plans to customers and offered paper to credit company for consideration).

But this contention fails because plaintiffs offer not a shred of record evidence that the Hardys actually believed that an agency relationship existed between JWH and WMC. The record does not reflect that the Hardys believed that JWH was somehow speaking for or on behalf of WMC in making representations concerning construction timeframes or that WMC somehow ratified those representations by JWH. There is no evidence that plaintiffs were confused as to which defendant they were actually dealing with or that the lines between those entities were blurred. To the contrary, the record evidence confirms that each plaintiff had a very clear understanding of the separate and distinct roles of JWH and WMC in this matter.[26] In the absence of evidence that plaintiffs believed JWH and WMC were acting as agents for each other, much less that the Hardys relied on that belief in any meaningful way, plaintiffs cannot hold WMC liable for misrepresentations made by JWH on an agency theory.[27]

---

[26]    The following excerpt from Mr. Hardy's deposition is representative of plaintiffs' understanding that they were dealing with two separate entities with two separate functions:

"Q:    Did you understand that Walter Mortgage Company was who was going to be approving the financing?
"A:    Yes.
"Q:    And that Jim Walter Homes was who was going to be building the house?
"A:    Yes, sir.
"Q:    Walter Mortgage didn't have anything to do with construction, and Jim Walter wasn't doing financing.
"A:    Yes."

(G. Hardy Dep., at 58-59.) Similarly, Mrs. Hardy answered affirmatively when asked whether she understood from the beginning that JWH was going to build the house, that WMC was a separate company, and that WMC was going to do the financing. (B. Hardy Dep., at 68.)

[27]    While plaintiffs' counsel suggests in summary judgment briefing that it was reasonable for the Hardys to believe that such an agency relationship existed, there is no evidence that the Hardys actually held such a belief. Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence. *See generally Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1st Cir. 1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment."); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("opinions, allegations, and conclusory statements of counsel do not substitute for evidence"); *Williams v. Saxon Mortg. Co.*, 2008 WL 45739, *5 n.9 (S.D. Ala. Jan. 2, 2008) (similar).

-20-

Even if plaintiffs had proffered evidence that they believed WMC and JWH to be acting as each others' agents, and that they relied on that belief in some material way, this theory of liability against WMC would remain meritless because any such belief would not have been reasonable. Plaintiffs argue that their agency belief was founded on the following: (a) the similarity of the companies' names; (b) a one-page form bearing the heading "Walter Mortgage Company Building Site Approval and Loan Closing Authorization" dated October 11, 2004, with a space for "Builder Representative" to sign (Plaintiffs' Exh. E); and (c) a letter from WMC's in-house counsel to plaintiffs' counsel dated May 15, 2006 (Plaintiffs' Exh. F). This showing falls well short of the mark. The similarities in name between JWH and WMC might reasonably cause a customer to conclude that they were related companies, but affiliated entities are not transformed by some legal alchemy into agents of each other. That WMC required JWH to sign a single form of the myriad closing documents confirming the understanding of the builder (JWH) for the benefit of the lender (WMC) that the customer (the Hardys) had approved the building site and was prepared for closing is in no way indicative of an agency relationship between the two; to the contrary, "[n]one of these actions is inconsistent with the extending of credit by an institution." *Kimbrel*, 476 So.2d at 97. It would be entirely commonplace and indeed expected for the lender to seek a thumbs-up from the builder before loaning a customer money to have the builder construct a house for that customer. For the Hardys to conclude, simply because WMC required JWH to sign a routine form reflecting the builder's readiness for the loan transaction to proceed, that WMC and JWH were acting as agents of each other would have been patently unreasonable. And the letter from WMC's counsel in May 2006 was written more than a year and a half after the closing, such that plaintiffs could not possibly have relied on that letter at the time of closing to form a belief that WMC and JWH were agents of each other.

For all of these reasons, plaintiffs' fraud and reckless misrepresentation claims against WMC for misrepresentations made by JWH are not viable, as a matter of law. The Motion for Summary Judgment is granted as to those claims.

### D.      *Mrs. Hardy's Claims of Fraud and Reckless Misrepresentation against JWH.*

A subset of the claims asserted in Counts III and V are claims by Mrs. Hardy against JWH for fraud and reckless misrepresentation based on JWH's representations on two occasions

prior to the execution of the Purchase and Sale Agreement that construction of the house would begin within a couple of months and would be completed within three or four months.

JWH seeks summary judgment on these claims on multiple grounds. As an initial matter, JWH argues that Mrs. Hardy's claims against it in Counts III and V must be dismissed because she was not a party to the underlying building contract. The Court has already considered and rejected this argument in Section IV.A., *supra*. The record clearly reflects that Mrs. Hardy is a signatory to one iteration of the Purchase and Sale Agreement with JWH, and a material factual dispute exists as to when that agreement was signed relative to the others (and therefore what legal effect, if any, it has). The Court cannot conclude as a matter of law on this record that Mrs. Hardy was not a party to the building contract; therefore, it is inappropriate to dismiss her claims against JWH for fraudulent inducement on that basis.

More substantial is JWH's alternative argument that Mrs. Hardy's fraud and misrepresentation claims are due to be dismissed because she cannot satisfy the reasonable reliance requirement. Alabama law requires a plaintiff bringing a claim for fraudulent inducement or reckless misrepresentation to prove reasonable reliance. *See, e.g., Billy Barnes Enterprises, Inc. v. Williams*, --- So.2d ----, 2007 WL 2812768, *6 (Ala. Sept. 28, 2007) ("An essential element of any fraud claim is that the plaintiff must have reasonably relied on the alleged misrepresentation.") (citation omitted); *Alabama Elec. Co-op, Inc. v. Bailey's Const. Co.*, 950 So.2d 280, 283 (Ala. 2006) ("Reasonable reliance is an essential element of a misrepresentation claim."). A corollary to the reasonable reliance requirement is that "[w]here a party has reason to doubt the truth of the representations or is informed of the truth before he acts, he has no right to act thereon." *Billy Barnes*, 2007 WL 2812768, at *6 (citation omitted); *see also Tyler v. Equitable Life Assur. Soc. of U.S.*, 512 So.2d 55, 57 (Ala. 1987) ("if a party has reason to doubt the truth of an oral representation or is informed of the truth before he acts, he may not reasonably act or rely on that representation"). In accordance with these principles, Alabama courts have routinely held that "fraud or misrepresentation cannot be predicated upon a verbal statement made before execution of a written contract when a provision in that contract contradicts the verbal statement." *Birmingham News Co. v. Horn*, 901 So.2d 27, 61 (Ala. 2004) (citing *Tyler*, 512 So.2d at 57); *see also Ramsay Health Care, Inc. v. Follmer*, 560 So.2d 746, 749 (Ala. 1990) ("when a person signs a writing containing language that is clearly contrary to

-22-

pre-execution parol representation, reliance is unjustified"); *Foremost Ins. Co. v. Parham*, 693 So.2d 409, 421 (Ala. 1997) (explaining that trial court may properly enter judgment as a matter of law on fraud claims where plaintiff made deliberate decision to ignore written contract terms, despite ability to read and understand such terms).

Mrs. Hardy contends that JWH misrepresented to her how quickly the company would construct the Hardys' home, and that she reasonably relied on those misrepresentations to her detriment by executing the Purchase and Sale Agreement.  The inescapable obstacle confronting Mrs. Hardy is that the Agreement she signed (and all other iterations of the Purchase and Sale Agreement, for that matter) clearly provided as follows: "NO COMPLETION DATE HAS BEEN REPRESENTED OR IS A PART OF THIS CONTRACT."  (Plaintiffs' Exh. D, ¶ 4.) Thus, Mrs. Hardy was fully informed at the time she signed the building contract that JWH was not making any promises or representations to her about when construction of the house would be completed.  Based on that unequivocal contract language (underlined and in all capital letters, no less) that no completion date was represented, and in accordance with Alabama law as set forth in the *Birmingham News* / *Tyler* / *Ramsay Health* line of authorities, it was unreasonable as a matter of law for Mrs. Hardy, in signing that agreement, to rely on prior oral representations of JWH sales representatives that the house would be built within a couple of months or that the building process would take three or four months.[28]

Because the record in the light most favorable to plaintiffs reflects that any reliance by Mrs. Hardy on oral representations of JWH representatives prior to executing the contract that construction would take a couple of months was unreasonable, as a matter of law, JWH is

---

[28]     In opposing JWH's Motion for Summary Judgment, Mrs. Hardy does not dispute that she is required to show reasonable reliance.  She does not contest the Alabama rule that the reliance requirement is not satisfied when an oral misrepresentation is contradicted by a provision in a subsequently executed contract.  She does not argue that Paragraph 4 of the Agreement she signed is not contrary to the alleged oral misrepresentations by JWH personnel. Instead, she merely contends that the facts of *Tyler* are distinguishable and that her reliance was reasonable in the specific circumstances at hand because completion time was very important to her.  These arguments cannot succeed, and alter neither the Court's analysis nor its conclusions in any material respect.

entitled to entry of summary judgment on Mrs. Hardy's claims under Counts III and V.[29]

   **E.     Mrs. Hardy's Claims of Negligence/Wantonness against JWH.**

   Next, the Court examines Mrs. Hardy's claims of negligence and wantonness against JWH.  As set forth in Count VI of the Complaint, these claims consist of the following embedded subclaims: (i) a claim that JWH negligently/wantonly represented that construction would begin within 60 days after closing; (ii) a claim that JWH negligently/wantonly failed to apply for and obtain construction permits in a timely manner; (iii) a claim that JWH negligently/wantonly failed timely to communicate with plaintiffs about the construction status; (iv) a claim that JWH negligently/wantonly failed to commence construction on the home for ten months; (v) a claim that JWH negligently/wantonly allowed unskilled workmen to perform on the job; and (vi) a claim that JWH negligently/wantonly used warped and weather material to construct the house.  (Complaint, ¶¶ 38-43.)

   1.     *The Representations Concerning Construction Timing.*

   With respect to Mrs. Hardy's negligence/wantonness claims relating to JWH's representations concerning the time needed to complete the project, JWH proffers only three arguments.  First, JWH maintains that this claim fails because there is no evidence that plaintiffs were told that construction would begin within 60 days after closing.  The Court disagrees.  Examining the summary judgment record (and particularly plaintiffs' own testimony) in the light most favorable to plaintiffs, a reasonable factfinder could conclude that a JWH representative told them in May 2004 that the house would be built within a couple of months after the paperwork was completed.  Certainly, there is a sufficient factual predicate to support this claim.  Second, JWH argues that this claim is actually a disguised claim for promissory fraud, but provides no explanation for why such a recharacterization of this claim from the stated theory (negligence/wantonness) to promissory fraud is appropriate.  *See generally Lamar Co., LLC v. Baldwin County Com'n*, 2007 WL 987478, *2 (S.D. Ala. Mar. 29, 2007) (observing that "[i]t is exceedingly clear that a plaintiff is the master of the complaint") (citations omitted).  These

_____

   [29]     In light of this determination, the Court need not reach JWH's alternative argument that Mrs. Hardy's claims in Counts III and V should be dismissed because there is no evidence that JWH intended to deceive her when the misrepresentations were made.

underdeveloped, skeletal arguments are simply insufficient to support entry of summary judgment in JWH's favor on this particular subpart of Count VI.

That said, JWH also states in conclusory terms that this negligence claim fails as a matter of law for the same reasons that the fraud and reckless misrepresentation claims cannot succeed. Alabama law is clear that reasonable reliance is an essential element of a negligent misrepresentation claim, just as it is for a fraud or reckless misrepresentation claim.  *See, e.g., Alabama Elec. Co-op.*, 950 So.2d at 283 ("Reasonable reliance is an essential element of a misrepresentation claim."); *City of Prattville v. Post*, 831 So.2d 622, 628 (Ala.Civ.App. 2002) (explaining that reasonable reliance is an element of a negligent misrepresentation claim); *Army Aviation Center Federal Credit Union v. Johnson*, 716 So.2d 1250, 1253 (Ala.Civ.App. 1998) (innocent misrepresentation clam requires plaintiff to show reliance).  The Court has already concluded in section IV.D., *supra*, that Mrs. Hardy could not reasonably have relied on the misrepresentations by JWH in this case.  Simply reframing the fraud / reckless misrepresentation claim as one for negligent or wanton misrepresentation does not undermine this conclusion, or overcome these defects. The reasonable reliance requirement remains unsatisfied.  For that reason, summary judgment will be entered in JWH's favor on this aspect of Mrs. Hardy's claims in Count VI.

> 2. *Failure to Apply for Permits, Communicate with Plaintiffs, and Commence Construction in a Timely Manner.*

With respect to this trio of negligence allegations, JWH maintains that it owed Mrs. Hardy no duty to apply for building permits, to provide her with status reports of construction, or to commence construction in a timely manner because she was not a party to the Purchase and Sale Agreement.  Movant is of course correct that duty and breach of duty are fundamental elements of a negligence cause of action in Alabama.  *See, e.g., S.B. v. Saint James School*, 959 So.2d 72, 97 (Ala. 2006) (to establish a negligence claim, plaintiff must prove duty to a foreseeable plaintiff, breach of that duty, proximate causation, and damage or injury); *Thompson v. Mindis Metals, Inc.*, 692 So.2d 805, 807 (Ala. 1997) ("It is settled that for one to maintain a negligence action the defendant must have been subject to a legal duty.") (citation omitted). However, JWH concedes that such a duty would or may exist if Mrs. Hardy were a party to the Purchase and Sale Agreement.  (Defendants' Brief, at 25.)  As this Court has indicated

repeatedly, there are material issues of fact as to whether Mrs. Hardy was or was not a party to the operative version of the building contract entered into by JWH and Mr. Hardy.  The Court therefore cannot conclude at this time that JWH owed no duties to Mrs. Hardy with respect to the construction project.[30]

Alternatively, JWH asserts that summary judgment is warranted on this claim because Mrs. Hardy is improperly attempting to transform a plain vanilla breach of contract claim into a tort cause of action.  It is well settled in Alabama that "a mere failure to perform a contractual obligation is not a tort."  *Barber v. Business Products Center, Inc.*, 677 So.2d 223, 228 (Ala. 1996).  It is also true, however, that Alabama courts have recognized exceptions to this rule. *See, e.g., Powers v. CSX Transp., Inc.*, 190 F. Supp.2d 1284, 1295 (S.D. Ala. 2002) (collecting cases).  The Eleventh Circuit has construed Alabama law on this point as providing that, while ordinary breach of contract does not constitute a tort, "[i]t is possible for a tort to arise in Alabama out of a breach of a duty implied by or arising out of a contract."  *Brown-Marx Associates, Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1371 (11th Cir. 1983); *see also Hamner v. Mutual of Omaha Ins. Co.*, 270 So.2d 87, 90 (Ala.Civ.App. 1972) (similar).[31]  The *Brown-Marx* panel distinguished between claims for breach of an obligation expressly set forth in the contract (which are not actionable in tort under Alabama law) and claims for breach of a duty implied by or arising out of the contract (which may be actionable in tort).  *See Brown-Marx*, 703 F.2d at 1371.  Applying that dichotomy here, Mrs. Hardy's claims concerning failure to apply for

---

[30]    The Court is of course aware of the general proposition that "[i]n Alabama, the existence of a duty is a strictly legal question to be determined by the court."  *Pritchett v. ICN Med. Alliance, Inc.*, 938 So.2d 933, 937 (Ala. 2006) (citation omitted).  Here, however, it is plain that if Mrs. Hardy was JWH's customer, then JWH owed her certain duties concerning that construction project.  If she was not, then no duty could attach.  The factual determination of the relationship between Mrs. Hardy and JWH therefore must be made antecedent to any legal assessment of duty by the Court.  *See generally Taylor v. Smith*, 892 So.2d 887, 892 (Ala. 2004) (explaining that the relationship between the parties a critical factor examined by Alabama courts in determining the existence of a duty).

[31]    *See generally First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1067 (11th Cir. 1990) (characterizing Alabama law as holding that when one contracts with another and expressly promises to use due care, he is liable in both tort and contract when his negligence injures the other party, and injured party has a choice of remedies).

permits within a reasonable time, failure to communicate with plaintiffs concerning performance, and failure to commence construction within ten months clearly fall within the latter category. JWH points to no aspect of the Purchase and Sale Agreement that expressly obligates it to perform those tasks. Because these negligence claims concern duties arising from the Purchase and Sale Agreement rather than breach of express contractual obligations in that agreement, the *Barber* rule is inapposite and these claims are cognizable in tort under Alabama law.

3. *Unskilled Workmen.*

Mrs. Hardy's next allegation of negligence is that JWH "negligently and/or wantonly allowed unskilled workmen to perform work on the job." (Complaint, ¶ 42.) The parties devote scant attention to this allegation in their briefs, making only the most cursory statements about the viability of that cause of action.[32] As the Court understands it, Mrs. Hardy's theory of negligence on this claim is that "JWH failed to act with reasonable care in hiring" the subcontractors who were building her home. (Plaintiffs' Brief, at 18.) Plaintiff cites neither case authority nor record evidence in support of this blanket statement.

Under Alabama law, an employer can be liable for negligent supervision, training or hiring if the plaintiff "can show by affirmative proof that the alleged incompetence of the employee was discoverable by the employer if it had exercised care and proper diligence." *Corbitt v. Home Depot USA, Inc.*, 2008 WL 616057, *19 (S.D. Ala. Mar. 3, 2008) (citations omitted); *see Voyager Ins. Companies v. Whitson*, 867 So.2d 1065, 1073 (Ala. 2003) (pointing out that master is responsible for servant's incompetency when notice or knowledge of such unfitness has been brought to him). Where, as here, a plaintiff fails to present any evidence that

---

[32] This outcome is an unfortunate but inevitable product of plaintiffs' shotgun pleading tactics, on the one hand, and defendants' failure to exercise diligence to bring about a repleader of such claims, on the other. Plaintiffs' single-line assertion in the Complaint that JWH negligently hired unskilled workmen to build the house is far removed from the essence of this dispute, and is a claim to which the parties appear to have devoted negligible attention either in discovery or in Rule 56 briefing. This case has little, if anything, to do with whether JWH tortiously allowed unskilled workmen onto the job site, yet plaintiffs' scattershot, everything-but-the-kitchen-sink pleading approach sweeps this claim within the ambit of this case, even though by all appearances plaintiffs have not seriously pursued such a theory. Simply put, this sub-issue underscores and reinforces the shotgun pleading concerns outlined by Judge Tjoflat in the Eleventh Circuit's recent *Davis* decision. *See* footnote 17, *supra*.

-27-

the defendant did not make an appropriate investigation before hiring its subcontractors, or that the defendant knew or should have known that the subcontractors required supervision, summary judgment is properly granted to the defendant on a negligent selection claim.  *See Muegge v. Heritage Oaks Golf and Country Club, Inc.*, 2006 WL 3591957, *3 (11th Cir. Dec. 12, 2006).[33] Summary judgment is entered in JWH's favor on this cause of action.

4.    *Warped/Weathered Material.*

As to Mrs. Hardy's contention that "Jim Walter negligently and/or wantonly utilized warped and weathered material in the construction of Hardys' home" (Complaint, ¶ 43), JWH first rehashes the "no duty" argument that it unsuccessfully advanced with respect to certain other of Mrs. Hardy's negligence claims.  That contention meets the same fate here, and its deficiencies do not warrant reiteration.  In its reply brief, JWH also suggests that summary judgment is appropriate on this theory because of plaintiff's "complete failure to produce sufficient evidence of JWH's negligence" in this regard.  (Reply Brief, at 15.)  This argument does not withstand scrutiny.  Viewed in the light most favorable to Mrs. Hardy, the record reflects that JWH delivered or caused to be delivered a load of lumber to the job site in June 2004, then allowed it to sit in the open for several months, where it was damaged by exposure to the elements.  The record further supports a finding that, even though plaintiffs reported this defective material to JWH, defendant used or caused to be used such defective materials in constructing plaintiffs' house, and became confrontational and indignant when plaintiffs complained.  Plaintiff has made a sufficient showing to reach a jury on the question of whether JWH was negligent or wanton in this regard.

F.    ***Mrs. Hardy's Trespass Claim against JWH.***

Finally, the Court examines the parties' respective arguments concerning Mrs. Hardy's trespass claim against JWH, as set forth in Count Seven.  This claim is predicated on evidence that JWH, its employees or agents came onto the Hardys' land on two occasions in August 2006 to work on the house construction project, after the Hardys had erected a gate, posted a "No

---

[33]    Alabama law also requires a party alleging negligent or wanton hiring to prove the underlying wrongful conduct of the employees.  *See Voyager*, 867 So.2d at 1073.  The Court is unable to discern from the record and briefing what tortious conduct Mrs. Hardy ascribes to the construction crews that JWH hired to build her house.

Trespassing" sign, and informed JWH officials that their work crews were not to come back onto plaintiffs' property.  It is undisputed that the Hardys initially consented to JWH entering onto the land to build the house; indeed, that was the fundamental purpose of the Purchase and Sale Agreement executed by the parties.  It is equally clear that Mrs. Hardy intended to revoke that consent in July and August of 2006 by erecting signs and notifying JWH that its work crews were no longer welcome on the land.  The question squarely presented on summary judgment is whether Mrs. Hardy's revocation of her consent had any legal effect.

"[A] license denotes the giving of one's consent to do or perform a specified activity; a license is a personal privilege and is generally revocable at the will of the licensor."  *Blackburn v. Lefebvre*, --- So.2d ----, 2007 WL 1874286, *5 (Ala.Civ.App. June 26, 2007) (citation omitted); *see also Wehby v. Turpin*, 710 So.2d 1243, 1251 (Ala. 1998) (same).  To revoke such a license of entry on one's land, the landowner need generally only withdraw her permission.  *See Shearer v. Hodnette*, 674 So.2d 548, 551 (Ala.Civ.App. 1995).  But the licensor's right to revoke a license is not boundless.  As far back as 1859, Alabama's highest court has recognized that "[i]t would be against all conscience to permit the defendant to revoke his license, after the plaintiff had acted upon it so far that great damage must necessarily result from the revocation." *Rhodes v. Otis*, 33 Ala. 578, 600 (Ala. 1859).  On this issue, another hoary Alabama authority, *Ferris v. Hoagland*, 25 So. 834 (Ala. 1899), is instructive.  In *Ferris*, the parties entered into a contract pursuant to which the defendant was to cultivate, gather and market a vineyard on plaintiff's land, and to receive compensation by selling the crop.  The plaintiff was unhappy with the defendant's performance, sought to exclude him from the land after the crop had ripened, and sued him for trespass when the defendant came back onto the land to gather the crop.  In deeming the plaintiff estopped from pursuing the trespass theory, the court explained that the parties' contract "gave a license to defendant to so enter [the plaintiff's property to cultivate the land], which, being granted upon a valuable consideration, was not revocable so as to destroy his right to collect from the crop after it had ripened ...." *Id.* at 836.  This ruling is founded on equitable principles that, given the defendant's expenditure of time and effort to plant and grow the crop on the vineyard, it would be unfair to the extreme for the plaintiff to be able to bar the defendant from the land after the grapes had ripened, thereby precluding the defendant from harvesting the crop and receiving compensation for the fruit of his labors by selling the resulting

-29-

crop.

Nearly three-quarters of a century after *Ferris* was decided, the Alabama Supreme Court formalized these equitable principles in the following terms: "[W]hen expenditures contemplated by the licensor have been made by the licensee, the license, having been acted upon so as to greatly benefit the licensor, is said to have been executed.  An executed license, for the reasons founded upon the equitable principle of estoppel, becomes irrevocable and confers upon the licensee a substantive equitable right in the property."  *Camp v. Milam*, 277 So.2d 95, 99 (Ala. 1973).  This remains an accurate statement of Alabama law today.  *See Blackburn*, 2007 WL 1874286, at *9 (deeming party's license to opposing party to use boat slip irrevocable, where it was contemplated that opposing party would rely, and opposing party did rely, on license to make certain expenditures, such as purchasing a parcel of land and rebuilding damaged pier and boat slip).

Viewing the summary judgment record in the light most favorable to plaintiffs, this case is markedly similar to *Ferris*, the vineyard case.  In executing the Purchase and Sale Agreement, Mrs. Hardy granted JWH a license to enter onto her land to build a house, for which JWH would receive no compensation whatsoever until the house was complete.  Much like the vineyard cultivator in *Ferris*, JWH in fact came onto Mrs. Hardy's land and expended substantial sums (in excess of $19,000, according to the record) in labor and materials to commence the construction process, including pouring the foundation and constructing the footings.  As with the landowner in *Ferris*, Mrs. Hardy became unhappy with the licensee's work and shooed it off the land, then sued in trespass when the licensee returned to continue the job, which it was required to do in order to recoup its expenses and receive compensation for its labors.  Under the equitable principles of estoppel recognized in *Rhodes*, *Ferris*, and *Camp*, it would be grossly unfair to allow Mrs. Hardy to bar JWH from her land and prevent it from finishing the construction project after JWH had spent substantial sums to improve such property to the benefit of the Hardys, when JWH could not receive a dime in compensation for its efforts until the job was complete.  Under these circumstances, Mrs. Hardy's license to JWH to enter onto her property to build the house was executed, and became irrevocable, as a matter of Alabama law.  Because JWH had an irrevocable license to enter onto the Hardys' land to build the house, and because its alleged trespasses on the land in August 2006 were in furtherance of its attempts to build the

house and receive the compensation it had been promised under the applicable agreements, Mrs. Hardy is estopped from proceeding in trespass against JWH. Summary judgment will be entered in JWH's favor on this cause of action.

## V.   Conclusion.

For all of the foregoing reasons, it is **ordered** that Defendants' Motion for Summary Judgment (doc. 66) is **granted in part, and denied in part**. The Motion is **granted** with respect to the following causes of action:

1. In Count One, plaintiffs' claims against defendant Walter Mortgage Company for declaratory judgment.

2. In Count Three, both plaintiffs' claims against defendant Walter Mortgage Company for fraud in the inducement, and plaintiff Bonnie Hardy's claims against defendant Jim Walter Homes for fraud in the inducement.

3. In Count Five, both plaintiffs' claims against defendant Walter Mortgage Company for reckless misrepresentation, and plaintiff Bonnie Hardy's claims against defendant Jim Walter Homes for reckless misrepresentation.

4. In Count Six, plaintiff Bonnie Hardy's claims against Jim Walter Homes for negligently and/or wantonly misrepresenting the construction timeframe, and for negligently and/or wantonly allowing unskilled workmen to perform work on the job site.

5. In Count Seven, plaintiff Bonnie Hardy's claims against Jim Walter Homes for trespass.

All of the foregoing claims are **dismissed with prejudice**. Additionally, Count Two of the Complaint is **dismissed without prejudice** by consent of the parties. In all other respects, the Motion is **denied**. Because this order disposes of all of plaintiffs' claims against defendant Walter Mortgage Company, the Clerk of Court is directed to terminate Walter Mortgage as a party to these proceedings.

Excluding the stayed claims of Mr. Hardy against Jim Walter Homes (all of which have been referred to arbitration), the only triable claims remaining are Mrs. Hardy's claims against Jim Walter Homes for declaratory judgment (Count One) and negligent/wanton failure to apply

-31-

for permits, failure to communicate with plaintiff regarding status, failure to commence construction in a timely manner, and use of damaged building materials (Count Six).

DONE and ORDERED this 1st day of April, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE